# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**AMANDA E. HARCROW**                                   **CIVIL ACTION**

**VERSUS**                                              **NO. 08-5186**

**MICHAEL J. ASTRUE, COMMISSIONER**                     **SECTION "I" (3)**
**SOCIAL SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of

the Commissioner denying her application for disability insurance benefits for workers ("DIW")

under Title II of the Social Security Act ("SSA") and her application for supplemental security

income ("SSI") payments under Title XVI of the SSA.   The matter has been fully briefed on cross-

motions for summary judgment and is ripe for review. For the following reasons, IT IS

RECOMMENDED that plaintiff's motion for summary judgment be DENIED, the Commissioner's

cross-motion be GRANTED, and plaintiff's case be DISMISSED WITH PREJUDICE.

## I.      Factual and Procedural Background

Plaintiff is a 39-year old female who last gainfully worked -- at the time of her initial

application for benefits -- from July 1995 through September 1996.  Plaintiff was 25 years old on

the alleged disability onset date, September 11, 1996. (Adm. Rec. at 22).  Plaintiff completed high

school and was attending Delgado Community College part-time on Tuesdays and Thursdays at the

time of the February 2006 hearing. (*Id.* at 470-71, 479). Plaintiff ultimately obtained an Associate Degree in American Sign Language Interpretation. (*Id.* at 816).

When plaintiff first applied for benefits in 1996, Disability Determination Services sent her to Dr. Martha Wickett for a psychiatric evaluation and to Dr. Miljana Mandich for a physical examination. On November 16, 1996, Dr. Wickett submitted her psychiatric evaluation of plaintiff. In the report, Dr. Wickett noted that plaintiff dressed in an eccentric fashion; her hair was dyed black; her complexion was very pale; she wore no makeup; and she had a gentle manner. (*Id.* at 109). Plaintiff wept on and off throughout the session. (*Id.*). She informed Dr. Wicket that she could not retain a job because she gets too emotional and "wrapped up" in her personal life. (*Id.*). She told Dr. Wicket that she hated people. (*Id.*). Plaintiff described problems with sleeping, weight loss, hallucinations and a past suicide attempt. (*Id.* at 110). Dr. Wickett found plaintiff oriented in all spheres, that her affect was appropriate to her rather depressed mood, and that she wept through most of the session. (*Id.* at 111). Dr. Wickett noted, however, that plaintiff could smile when she spoke of things that she enjoyed. (*Id.*). Dr. Wickett found that plaintiff's thought processes showed no looseness of movements, her speech was easily understood, her intelligence quotient was within normal limits and she related well. (*Id.*).

Dr. Wickett ultimately diagnosed plaintiff with Depression, a Personality Disorder Mixed and Dysthymic Disorder. (*Id.*). Dr. Wicket recommended therapy to relieve plaintiff's depression, but found plaintiff competent to manage her own affairs. (*Id.*) She noted that plaintiff has "difficulty in relating to other people because of her world view and her somewhat eccentric appearance and belief systems." (*Id.*).

After Dr. Mandich's physical examination of plaintiff, she reported that plaintiff complained of back aches, allergic sinusitis and joint pains associated with exposure to sun. (*Id.* at 112). Plaintiff reported frequent frontal headaches relieved by Tylenol or Ibuprofen. (*Id.* at 113). She reported chronic problems with sinus congestion and periodic coughs that produced yellowish sputum when she had significant nasal drip. (*Id.* at 113). Dr. Mandich also found that, even though there was no limitation of motion in plaintiff's neck or thoracolumbar area, plaintiff complained of pain in the "mid cervical spine with extreme extension of the neck and in the mid-back between her shoulder blades extending down the middle to the lumbrosacral junction and is associated with extreme flexion and backward extension." (*Id.* at 114). Plaintiff's straight-leg raise test was negative at 90 degrees. (*Id.*). Dr. Mandich found plaintiff to be oriented in four spheres and of average intelligence. (*Id.* at 115). Plaintiff also denied any significant depression, anxiety, hallucinations or suicidal thoughts. (*Id.*). Dr. Mandich also noted plaintiff's general aversion to people and that she reported trouble in dealing with people at work. (*Id.*).

On November 15, 1996, Dr. Albert Hendler issued his radiological findings of CT scans that Dr. Mandich had ordered. Dr. Hendler diagnosed plaintiff with moderate dorsal scoliosis with convexity to the left as well as mild degenerative changes that affected the dorsal spine. (*Id.* at 120). Examination of the cervical spine revealed loss of normal cervical lordosis reflecting spasm. (*Id.*). Examination of the lumbar spine revealed failure of closure of a neural arch of S1 as well as a narrow fifth lumbar interspace. (*Id.*). Dr. Hendler noted no evidence of fracture, spondylolisthesis or other disease. (*Id.*).

On January 2, 1997, psychologist Steven Dolh completed a psychiatric review of plaintiff.

In his Summary of Functional Limitation Rating for "B" criteria, Dolh evaluated plaintiff's functional limitations as the result of mental disorders as slight to moderate and found none severe. (*Id.* at 128). Dolh found no significant problems in plaintiff's functional capacity assessment and concluded that she was "able to interact appropriately in casual settings [and] respond to [positive] supervision." (*Id.* at 132).

On January 17, 1997, plaintiff was treated at the Medical Center of Louisiana for a complaint of back pain and sinus complaints. (*Id.* at 137). She reported a long-standing history of back pain that had worsened in the past six months and that she had tried to treat with Tylenol and Advil. (*Id.*). She also reported sinus-related symptoms. A physical exam revealed enlarged turbinates (mucous membranes) but no other positive findings. (*Id.*). The ultimate assessment was sinus flare-up, anemia, and back pain, and the physician ruled out pregnancy and mental health. (*Id.*). She was prescribed Soma every four hours, Fergon four times a day and Erythromycin four times a day and scheduled for a follow-up appointment. (*Id.*).

On January 22, 1997, Dr. Heydle Sciacca, a neurologist at the Medical Center of Louisiana, treated plaintiff, who reported being status post-head injury in 1989. (*Id.* at 135). She also reported neurological symptoms for two months that had worsened in the past three weeks. (*Id.*). Dr. Sciacca ultimately assessed complaints of sinus, head aches, back pain and fragmentation/partial sensory seizures. (*Id.*). He ordered an EEG, continued medication, a return trip to the clinic after it received the EEG results and a trip to a dental clinic. (*Id.*).

On February 7, 1997, Dr. Sciacca treated plaintiff at a follow-up examination. Plaintiff reported a sense of an electric shock for a split second during her EEG reading and intermittently

thereafter. (*Id.* at 163). The EEG results were reported as normal awake/sleep. (*Id.*). Plaintiff also reported a head cold, panic attacks and back pain. (*Id.*). Dr. Sciacca's assessment was panic attack cycling emotions and dysthymia. (*Id.*). He prescribed 200 milligrams of Tergretol two times a day, 50 milligrams of Zoloft once a day and Soma every four hours. (*Id.*).

Two months later, on April 4, 1997, Dr. Sciacca again treated plaintiff for constant headaches, sinus-related symptoms and numbness in her fingers. (*Id.* at 162). Dr. Sciacca assessed positive phalanges and positive Tinnels. (*Id.*). He reported plaintiff's headache as bi-frontal, tight, pressing and shifting. (*Id.*). The assessment was carpal tunnel syndrome, tension and sinus-related symptoms. (*Id.*). He prescribed continued medication.

This line of evaluation and treatment continued. Between April 11, 1997 and April 24, 1998, Dr. Sciacca treated plaintiff on seven further occasions. Dr. Sciacca's evaluations and treatment on those seven occasions are similar to those detailed above. (*Id.* at 145, 147, 149, 153, 155, 156 and 158).

During this time period, Dr. Erick Blaudeau and Dr. Harold Neitzschman evaluated plaintiff's radiology reports. The lumbar spine x-ray report indicated disc space narrowing at L4-L5 and L5-S1, mild facet sclerosis at L5-S1 and no abnormal curvature. (*Id.* at 159). The thoracic spine x-ray revealed slightly reversed cervical lordosis, and no other evidence of malalignment or fracture. (*Id.*). Clinical correlation of the lordosis was requested. (*Id.*). There was a soft tissue prominence in the region of the adenoids. (*Id.* at 160).

Plaintiff began treatment at the Central City Mental Health Center ("CCMHC") in May 1997. (*Id.*). Dr. Charles Steck evaluated her on May 12, 1997. Her presenting problems included

crying, depression and throwing things. (*Id.* at 172). She reported that her back hurt. (*Id.* at 173). Dr. Steck noted that she dressed all in black with black lipstick, a black motorcycle jacket with handcuffs and that she related that she saw herself "as some evil monster." (*Id.* at 175). He noted her complaints of insomnia. (*Id.*).

Dr. Steck diagnosed depression and dissociation disorder. (*Id.* at 176). He admitted plaintiff to CCMHC as "Gravely Disabled" and noted as reasons for such determination her serious impairment in function in a major life role and her inability to cooperate with care givers without mental treatment. (*Id.* at 177). He prescribed two tabs of Desrel per night. (*Id.* at 184). On May 15, 1997, staff at CCMHC diagnosed Depression 311.00 and Dissociation Disorder 300.15 and accepted her into the treatment program. (*Id.* at 169).

On August 11, 1997, Dr. Steck interviewed plaintiff. He noted that she looked sad, did not have much to say and was about to cry. (*Id.*). She responded that she could not get her "mind to shut up," and again reiterated that she did not like people. (*Id.*). Dr. Steck diagnosed her with Major Depression Recurrent, 296.34. (*Id.*). He noted that she experienced auditory hallucinations. (*Id.*). He prescribed Trazadone and Prozac. (*Id.* at 184). As with Dr. Sciacca, Dr. Steck evaluated plaintiff numerous more times with near-identical diagnoses. Dr. Steck continued to prescribe medication to plaintiff. Ultimately, in 1999, he referred plaintiff to Dr. Melanie Vega for a possible bi-polar condition diagnosis.

Edmund M. Lawton, Ph.D., performed a Psychological Evaluation of plaintiff for the CCMHC on August 26, 1997. (*Id.* at 170-71). His evaluation instruments included the Wechsler Silverstein IQ, Bender Gestalt Test, Psychological Interview, Rorschach Inkblot test and the Draw-

a-Person Test. (*Id.* at 170). He noted that she was negative from the beginning of the interview, was oriented but was foul throughout the testing. (*Id.*). She reported that she had attempted suicide. (*Id.*). Dr. Lawton diagnosed plaintiff with Axis I 296.3 Major Depression, recurrent, Axis II 301.83 Borderline personality disorder. (*Id.* at 171). He also noted: "The patient claims she cannot work but I saw no evidence of this in the interview. She does have a high school education and is of average intelligence. She has been denied SSI twice. If indeed, she cannot work, she should continue to apply for SSI." (*Id.*).

Dr. Melanie Vega began to treat plaintiff on March 30, 1999. (*Id.* at 288). Dr. Vega reported that plaintiff was easily angered, tearful, threw temper tantrums when irritated, suffered panic symptoms around crowds, and suffered feelings of depression and worthlessness. (*Id.* at 299). CCMHC discharged plaintiff on May 9, 2000. Her discharge summary diagnosis from CCMHC was Depression 311.00, Dissociation Disorder 300.15 and Personality Disorder 301.90 (*Id.* at 382). CCMHC also discharged her for poor attention and because she had failed to keep appointments. (*Id.* at 382).

Dr. Joel Gleason evaluated plaintiff on August 18, 2000 for readmission to the CCMHC. (*Id.* at 374-77). Plaintiff reported that she was running out of her medication that helped her to cope. (*Id.* at 374). She was alert with an unpleasant and negative attitude and a nasty tone. (*Id.* at 375). Dr. Gleason recommended one-on-one counseling with weekly psychotherapy, group therapy, medication and encouragement to enter the working world. (*Id.* at 377).

On April 10, 2001, Dr. Vega noted that plaintiff continued to suffer symptoms of depression and had tried several medications, some with no significant improvement. (*Id.* at 288). Dr. Vega

reported that plaintiff suffered from a chronically-relapsing condition, Major Depression, and, despite appropriate treatment, still suffered severe symptomatology. (*Id.*). Dr. Vega concluded, "Given all of the above, it is evident that Ms. Harcrow has difficulty in dealing appropriately with others, difficulty following and taking instructions from others and in finishing tasks. Also, her mental illness causes her to be emotionally labile, unpredictable and unreliable. Please take this into consideration in Ms. Harcrow's claim for disability." (*Id.*).

On June 27, 2001, Dr. Wickett re-evaluated plaintiff, ultimately concluding that plaintiff suffers from Personality Disorder Mixed with narcissistic and borderline features and a Depression Not Otherwise Specified. (*Id.* at 304). Dr. Wickett also noted that plaintiff can manage her own affairs. (*Id.*) On March 27, 2002, Dr. Vega updated her April 1, 2001 assessment. Dr. Vega noted that plaintiff continued to suffer from, *inter alia*, increased anxiety symptoms, depression, excessive worry and thoughts of suicide. (*Id.* at 319). Dr. Vega again diagnosed her with Major Depression. (*Id.*).

The administrative record reveals that plaintiff was treated intermittently by Dr. Tlaloc Alferez at Robert D. Lesser, M.D. and Associates from May 20, 2004 through October 13, 2006. (*Id.* at 399-461, 661-713). At intake, Dr. Alferez noted that plaintiff was a 32-year old, white female who presented for a physical exam for school. (*Id.* at 438). Plaintiff complained of lower back pain for more than five years. (*Id.*). She also reported three motor vehicle accidents and described her discomfort as a sharp sensation that was intermittent but aggravated by certain activities. (*Id.*). She complained of joint pain and reported that the sun made her hurt more. (*Id.*). She reported a past medical history of temporal lobe epilepsy, lower back pain, hyperhydrotis, depression and obsessive

compulsive disorder. (*Id.*). Her review of systems included weight loss, bad teeth, constipation, and joint pain of the knees, shoulders, elbows and ankles. (*Id.*). She had a skin rash and pruritus. (*Id.*). She described a history of anemia and frontal headaches, which were light aggravated. (*Id.*). She also reported suffering from anxiety and insomnia. (*Id.*). Dr. Alferez described findings with respect to her left patella and noted a decreased sensation to lower extremities. (*Id.* at 439). He also reported tenderness to the left side of her back. (*Id.*). He also questioned the presence of fybromyalgia and ordered an x-ray and an MRI. (*Id.*). He ordered a follow-up examination in two to four weeks. (*Id.*).

On June 25, 2004, plaintiff presented for the follow-up examination. (*Id.* at 440-41). Her complaints included fibromyalgia, dysmetabolic syndrome, lower back pain, dental caries and allergic rhinitis. (*Id.* at 440). Her review of systems included lower back pain, numbness to lower extremities and insomnia. (*Id.*). Dr. Alferez noted her weight at 225 pounds, that she was in no acute distress, and her physical examination remained unchanged. (*Id.*). Dr. Alferez noted that she had elevated blood pressure times two so he discussed lifestyle changes with her. (*Id.* at 441). For her dental caries, he prescribed Amoxicillin. (*Id.*). He prescribed an MRI for the lower back pain. (*Id.*). On July 23, 2004, plaintiff presented for another follow-up examination. (*Id.* at 440-41). Her complaints included fibromyalgia, dysmetabolic syndrome, lower back pain, dental caries, hyperlipidemia, depression and osteoarthritis. (*Id.* at 442). He noted her weight at that time as 216 pounds, a decrease of nine pounds from the previous visit. (*Id.*).

Dr. John Charles Sandoz issued his report on the MRI of the lumbar spine on July 16, 2004. (*Id.* at 408). He reported a central herniated disc with a right-side lateral component at L4/L5 that

produced mild neural foramina narrowing of the right side and minimal spinal canal stenosis. (*Id.*). He also noted a small right lateral herniated disc at L5/S1that produced minimal narrowing of the right-side neural foramina and that touched the S1 root of the right side. (*Id.*). He ultimately concluded that there existed at least one herniated disc and a second, broad-based bulging protrusion at another site. (*Id.*). The herniated disc touched the root at S1. (*Id.*).

Between August 23, 2004 and December 27, 2005, plaintiff presented for follow-up examinations and medication refills approximately nine times. (*Id.* at 444-61). Plaintiff's list of complaints continued to include fybromyalgia, dysmetabolic syndrome, lower back pain, dental caries, arthritis and anemia. (*See, e.g., id.* at 444-45). She also complained of constipation, insomnia, sore throat and tooth aches. (*See, e.g., id.* at 444-47). Her stressful life included a sick husband. (*Id.* at 447). During this time, plaintiff also consulted a psychiatrist, and her medication included Prozac, Klonopin and Trazadone. (*Id.* at 448). Plaintiff also reported taking Tylenol for fever and Claritin. (*Id.* at 449). Test results also indicated a broad-based bulge at L/4-L/5 and a right-side herniated disc at L5/S1. (*Id.* at 448). During this time, plaintiff also experienced problems with her medication as she was nursing and could not take some of the prescriptions. (*Id.* at 441, 445). Plaintiff's weight also fluctuated notably during this period.

Plaintiff also reported that she had no time for physical therapy. (*Id.* at 451). She had callused feet and was referred to a podiatrist. (*Id.*). On December 2, 2005, Dr. Alferez ordered an E.B.V. infection test. (*Id.* at 427). Dr. John Elgin evaluated the results and found a positive E.B.V. early antigen that showed a chronic/active infection. (*Id.*). On this same date and on December 27, 2005, plaintiff still reported fibromyalgia, lower back pain, headaches, irritable bowel syndrome,

allergic rhinitis and lipidemia. (*Id.* at 458-61). She still demonstrated fatigue, and Dr. Alferez questioned whether plaintiff suffered from chronic fatigue syndrome and depression. (*Id.* at 459). During the December 27 evaluation, the doctor also questioned whether she suffered from irritable bowel syndrome. (*Id.* at 461).

Plaintiff filed an initial SSI application on October 24, 1996, in which she alleged disability since September 11, 1996. (*Id.* at 54-56). After denials both initially and on reconsideration (*id.* at 34-43), plaintiff timely applied for a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 50-51). On May 26, 1998, the ALJ conducted an administrative hearing, and, on June 12, 2008, the ALJ denied plaintiff's claim. (*Id.* at 185-94). Judge James A. Paisley determined that plaintiff was not disabled. (*Id.* at 193). Plaintiff sought review of Judge Paisley's findings. (*Id.* at 207-09). On June 29, 2001, the Appeals Council remanded the matter to the ALJ to further consider plaintiff's mental impairments, to further elaborate on the ALJ's finding as to plaintiff's credibility and to include rationale as to the ALJ's finding on the "B" criteria rated in the Psychiatric Review Technique Form. (*Id.* at 216-217).[1]

On April 9, 2002, ALJ Elving Torres conducted the second administrative hearing. (*Id.* at 323-34). Judge Torres also found that plaintiff was not disabled. (*Id.* at 333-34). On March 2, 2005, the Appeals Council vacated Judge Torres's findings of fact and remanded for further hearing with instructions to obtain additional evidence and to make specific findings of fact regarding a function-by-function assessment of the ability to work, an evaluation of the "B" criteria to assess

---

[1]     On May 11, 2001, plaintiff filed a new application for DIW benefits and SSI benefits. The Appeals Council ordered the two matters consolidated. (*Id.* at 217).

the severity of mental impairments and an identification of the appropriate regulation (from Appendix 1, Subpart P, Regulation No. 4) under which he ruled. (*Id.* at 336).

On February 2, 2006, Judge Charles Kunderer, the new ALJ, conducted a third administrative hearing. (*Id.* at 467-98). On March 29, 2006, the ALJ again denied plaintiff's application for disability. (*Id.* at 17-24). Plaintiff timely appealed this decision to the Appeals Council, but this time, on December 2, 2006, the Appeals Council denied the request for review. (*Id.* at 8-10). Plaintiff sought review in this Court, but, while that suit was pending, the SSA granted plaintiff's third application for benefits. (*Id.* at 542-43). Dr. Robert McFarlain had in the interim found that plaintiff had established disability for a closed period beginning December 1, 2006. (*Id.*). The Commissioner thus asked this Court to remand the suit to the agency so that the Appeals Council could determine whether its recent grant of disability impacted its earlier denials. [Doc. #31, Civ. A. No. 06-10919, E.D. La.]. This Court granted the Commissioner's motion and remanded the matter on February 14, 2008. [Doc. #37, Civ. A. No. 06-10919, E.D. La.].

On August 7, 2008, the ALJ -- again, Charles Kunderer -- conducted the administrative hearing on remand. (*Id.* at 810-24). On September 25, 2008, the ALJ again found that plaintiff was not disabled under the SSA and also rejected Dr. McFarlain's Disability Determination Services' holding, thus finding plaintiff *not disabled at any time* through the September 25, 2008 administrative decision. (*Id.* at 501-22). Plaintiff appealed the decision to the Appeals Council on September 24, 2008. (*Id.* at 523-24). The Appeals Council declined jurisdiction, thus rendering the ALJ's decision a final determination of the SSA. (*Id.* at 499-500A). This appeal followed.

## II.    Standard of Review

The function of a district court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards to evaluate the evidence. *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir.1991). If the Commissioner's findings are supported by substantial evidence, this Court must affirm them. *Martinez*, 64 F.3d at 173.

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401(1971); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002). It is more than a scintilla, but may be less than a preponderance. *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2002).

A district court may not try the issues *de novo*, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *Spellman*, 1 F.3d at 360. The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. (1992). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Carey,* 230 F.3d at 135. Any of the Commissioner's findings of fact that are supported by substantial evidence are conclusive. *Ripley*, 67 F.3d at 555. Despite this Court's limited function on review, the Court must scrutinize the record

in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir.1990).

## III.    Entitlement to Benefits under the Act

To be considered disabled and eligible for disability benefits under the Act, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant, such as the plaintiff, is considered disabled only if her physical or mental impairment is so severe that she is unable to do not only her previous work, but cannot, considering her age, education and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which she lives, whether a specific job vacancy exists or whether she would be hired if she applied for work. 42 U.S.C. § 1382(a)(3)(B). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 - 404.1599 & Appendices, §§ 416.901 t - 416.988 (1995). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. *Id*. §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994).

In *Shave v. Apfel*, 238 F.3d 592 (5th Cir.2001), the Fifth Circuit restated the five-step procedure to make a disability determination under the Social Security Act:

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. First, the claimant must not be presently working at any substantial gainful activity. Second, the claimant must have an impairment or combination of impairments that are severe. An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.

*Shave*, 239 F.3d at 594 (quoting *Crowley v. Apfel*, 197 F.3d 194 (5th Cir.1999)). If the ALJ determines that a plaintiff is not disabled under Step V of the five-part test – as he did here – the ALJ must establish that the claimant has a "residual functional capacity," given the claimant's age, education, and past work experience, to perform other work available in the national economy. *Leggett v. Chater*, 67 F.3d 558, 564 n.11 (5th Cir. 1995). Step V also requires the Commissioner to use the medical-vocational guidelines to make his disability determination. *Id.*

The four elements of proof weighed to determine whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995). "The Commissioner, rather than the

courts, must resolve conflicts in the evidence." *Id*.

## IV. ANALYSIS

1.     **Whether the ALJ properly weighed the opinions of the Non-Examining Physicians.**

In her first claim of error, plaintiff argues that the ALJ erred when he gave "great weight" to the opinion of non-examining physician Dr. Steven Dolh and "little weight" to the contradictory opinions of plaintiff's treating physicians, Drs. Steck and Vega.[2] Plaintiff first complains that the ALG failed to mention Dr. Vega's April 10, 2001 report, in which Dr. Vega opined that due to plaintiff's inability to deal appropriately with others, her difficulty in following instruction and her difficulty in finishing tasks, plaintiff was unpredictable and unreliable and should be considered eligible for disability benefits. (Adm. Rec. at 288). Contrary to plaintiff's argument, however, the ALJ specifically addressed Dr. Vega's 2001 report in his opinion. (*Id.* at 518-19). The ALJ reviewed Dr. Vega's 2001 report and explicitly found that the evidence in the record did not support her ultimate opinion. (*Id.*) ("There is no evidence of record of claimant continuously complaining of depression, crying spells, worthlessness, poor sleep, anxiety, excessive worrying, poor energy, panic attacks, poor motivation, and intermittent suicidal ideation, along with homicidal thoughts."). The ALJ determined that, contrary to Dr. Vega's findings, the record evidence demonstrated that

---

[2]     At the outset, the Court rejects any of plaintiff's arguments that address the ALJ's 2006 decision. When the Appeals Council vacated the March 29, 2006 opinion and remanded the matter to the ALJ to reconsider plaintiff's case, the ALJ was not bound by the ALJ's earlier findings. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("When the Secretary remands cases for re-determination, there is no rule of issue preclusion."). The ALJ's 2006 opinion is not before this Court for review. This Court reviews the final ruling of the SSA, which is the September 25, 2008 opinion here. Accordingly, any arguments based on the 2006 opinion are irrelevant.

plaintiff's medication had been effective in reducing her depression and that plaintiff had reported no side effects from the medication. (*Id.* at 519). "[A]lthough the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quotation omitted). Accordingly, this argument lacks merit.

Plaintiff also contends that the opinion of non-examining physician Dr. Dolh is substantially contradicted by the medical evidence and the reports of treating physicians Drs. Steck, Vega, Gleason, Wickett and Lawton. Given the conflicting opinions of the treating physicians, plaintiff argues that the ALJ gave "controlling weight" to the opinions of Drs. Dolh and Barnett. This is simply incorrect. While the ALJ recognized that both Drs. Dolh and Barnett determined that plaintiff is not disabled, the ALJ – in outlining the physician's opinions – even disagreed with Dr. Dolh's finding that plaintiff is only moderately restricted in social interactions. (*Id.* at 517). The ALJ ultimately concluded: "Insofar as these conclusions are consistent with the findings and conclusions rendered herein, they are accepted as valid." (*Id.* at 518). The ALJ did not accord "controlling weight" to the reports of Drs. Dolh and Barnett.

While the Court recognizes that "[w]hen a non-examining physician's conclusions either contradict or are unsupported by an examining physician's findings, the non-examining physician's report does not provide substantial evidence," *Newton v. Apfel*, 209 F.3d at 448, 458 (5th Cir. 2000), the Court also recognizes that one of plaintiff's treating physicians did not find her disabled. As noted above, Dr. Lawton, after his psychological evaluation of plaintiff, reported that "[t]he patient

claims she cannot work but I saw no evidence of this in the interview. She does have a high school education and is of average intelligence. She has been denied SSI twice. If indeed, she cannot work, she should continue to apply for SSI." (Adm. Rec. at 171).[3] Accordingly, the Court finds that at least one of plaintiff's treating physicians – a physician on which she relies – supports the findings of the non-examining physicians.

As noted above, "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley*, 809 F.2d at 1057 (quotation omitted). Substantial evidence supports the ALJ's reliance on the opinions of Drs. Dolh and Barnett. Because evidence supports their reports in the form of at least the opinion of one treating physician, the ALJ did not err when it relied on their opinions. Moreover, because evidence contrary to the ultimate conclusions of Dr. Vega existed in the record, the ALJ did not err when he gave "little weight" to her conclusions.

2. **Whether the ALJ erred when he found that plaintiff's impairments do not singly or in combination meet a listing.**

Plaintiff alleges numerous errors here that allegedly require reversal of the ALJ's opinion. First, plaintiff alleges that the same ALJ presented findings in his 2008 opinion that contradict his findings in his 2006 opinion. That the ALJ may have done so is irrelevant, however, as he was not

_____

[3]      The Court also notes that Dr. Gleason, at the time of plaintiff's evaluation for readmission to the CCMHC, recommended as part of plaintiff's therapy that she be encouraged to enter the working world. (Adm. Rec. at 377). Accordingly, at least one of plaintiff's evaluating physicians thought that re-entry into the working world would help plaintiff's mental condition.

bound by the findings in the 2006 opinion after the Appeals Council vacated his opinion and remanded the matter to him for further consideration. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

At step three in the five-step sequential evaluation, the ALJ found that the severity of plaintiff's impairments did not meet or equal a listing under the regulations. (Adm. Rec. at 521). Plaintiff contends that she meets Listing 1.04 *Disorders of the spine*. Listing 1.04 provides:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt. P, Appendix 1, § 1.04(A)-(C). While the ALJ determined that plaintiff suffers from degenerative disc disease, (*id.*), the ALJ did not err in finding that there was no evidence in the record that plaintiff satisfied subsections A, B or C of Section 1.04. There is substantial evidence to support the ALJ's determination.

Specifically, the ALJ found:

Claimant has full range of motion throughout the lumbar spine. Neurological

examinations remained intact. Straight leg raising is negative. She has no impairment in gait or station. X-rays of the cervical spine in November 1996 revealed spasms only. X-rays of the lumbar spine revealed closure of the neural arch of S1, as well as narrowed [sic] 5th lumbar interspace. (Exhibit 2F; 5f-18) MRI of the lumbar spine performed on July 16, 2004 revealed a broad based bulge at L4/L5 with right sided neural foramina narrowing and minimal spinal canal stenosis. Right lateral herniated disc and L5/S1 with minimal narrowing of the right neural foramina touching the right side S1 nerve roots. (Exhibit 14F-13) CT of the cervical spine performed in May 2006 revealed degenerative changes only. (Exhibit B16F-43) EMG/NCV of upper extremities performed in August 2007 revealed the left ulnar CMAP amplitude was abnormal. The isolated upper extremity motor finding was of unclear clinical significance. (Exhibit B24F-39)

(*Id.* at 509).[4] The record evidence supports the ALJs' findings. Dr. Mandich found that plaintiff suffered recurrent, non-severe neck and lower back pain. (*Id.* at 116). Dr. Mandich reported that plaintiff's range of motion in her spine and extremities was unlimited. (*Id.* at 114, 116). In addition, plaintiff's straight leg test was negative. (*Id.* at 114). Dr. Hendler found no evidence of joint involvement or spondylolisthesis. (*Id.* at 120). Dr. Hendler also noted that plaintiff's cervical bodies, interspaces and posterior elements did not appear unusual. (*Id.*). There was no evidence of fracture, dislocation or other disease. (*Id.*). Plaintiff can not meet the requirements of subsection A.

There is also no evidence that plaintiff underwent surgery in the record apart from an operation to remove a cyst from her lower back when plaintiff was three. Accordingly, plaintiff can not satisfy subsection B. Lastly, all of the record evidence demonstrates that plaintiff has had no limitation in her functional activities or her ability to ambulate. (*Id.* at 111, 114, 116). Neither can plaintiff satisfy the requirements of subsection C.

---

[4]    Although unclear, it appears that the ALJ adopted the medical reports that he recites in this passage.

Plaintiff also contends that she suffers from and is being treated for fibromyalgia. Plaintiff argues that the record evidence demonstrates that she suffers from a combination of symptoms of fibromyalgia: irritable bowel syndrome, chronic headaches, insomnia, severe fatigue and memory problems. Plaintiff also notes that the evidence shows that she has experienced sensitivity and generalized joint pain in her legs and arms for over ten years. The ALJ held that

> [f]ibromyalgia is not a medically determinable condition in this case. Fibromyaliga and questionable chronic fatigue syndrome was diagnosed based on claimant's saying that she was fatigued. She had two small children at home at the time and working [sic] as a projectionist. (Exhibit 14F-63)

(*Id.* at 506).

It is true that Dr. Lesser listed fibromyalgia as a potential treatment item in his medical notes. (*Id.* at 444). Apart from a prescription for Ultram, however, there is no indication that Dr. Lesser offered any other treatment for fibromyaliga or that he diagnosed plaintiff with the symptoms of the disease. (*Id.* at 453). While plaintiff reported to Dr. Lesser that she felt fatigued, he also explicitly noted that she had two small children at home. (*Id.* at 458). In addition, plaintiff testified that at the same time, she was working part-time as a theater projectionist and attending classes at Delgado Community College. (*Id.* at 816-17). Accordingly, given that no physician explicitly diagnosed plaintiff with fibromyalgia and other reasons existed for plaintiff's fatigue (noted by Dr. Lesser as well), the ALJ did not err when he determined that plaintiff's fibromyalgia was not a medically-determinable impairment. Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Carey,* 230 F.3d at 135.

Plaintiff also argues that she has an affective disorder, which meets a listing under the

regulations. To be disabled due to an affective disorder (*e.g.*, depression), plaintiff must satisfy the requirements of both Section 12.04, subsections A and B or subsection C:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or
>
> d. Psychomotor agitation or retardation; or
>
> e. Decreased energy; or
>
> f. Feelings of guilt or worthlessness; or
>
> g. Difficulty concentrating or thinking; or
>
> h. Thoughts of suicide; or
>
> i. Hallucinations, delusions, or paranoid thinking; or
>
> 2. Manic syndrome characterized by at least three of the following:
>
> a. Hyperactivity; or
>
> b. Pressure of speech; or
>
> c. Flight of ideas; or
>
> d. Inflated self-esteem; or
>
> e. Decreased need for sleep; or
>
> f. Easy distractability; or
>
> g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
>
> h. Hallucinations, delusions or paranoid thinking; or
>
> 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
>
> AND
>
> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration;
>
> OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpt. P, Appendix 1, § 12.04(A)-(C).

Plaintiff argues that she satisfies subsection A because the record evidence demonstrates that she has suffered: (1) anhedonia/pervasive loss of interest in almost all activities; (2) appetite disturbance with change in weight; (3) sleep disturbance; (4) decreased energy; (5) feelings of guilt or worthlessness; (6) difficulty concentrating or thinking; (7) thoughts of suicide; and (8) hallucinations, delusions, or paranoid thinking. Defendant contends that the record fails to establish that these symptoms were persistent.

Pretermitting whether plaintiff has satisfied subsection A, the Court finds that she has failed to satisfy subsection B. Plaintiff argues that the record evidence demonstrates marked difficulties in maintaining social functioning at work and in maintaining concentration, persistence or pace. The ALJ determined:

> In the daily adaptive functioning area claimant was not impaired for occupational purposes. Dressing, bathing and grooming were not a concern. She reported she managed her own funds. She maintained full custody of her children. She drove and ran errands to the grocery, and bank and her children back and forth to their nursery and she to her classes at Delgado and work in Chalmette. She cooked and did the dishes, vacuumed, swept, mopped, made the beds, and laundry. She did not report needing frequent breaks in between and during tasks. She could make decisions not only in her best interest but best [sic] interest of her family.

. . . .

When asked about past relationships with coworkers and supervisors she admitted to psychiatrist Wickett that she couldn't seem to hold down a position as she got too emotional. "Everything that happens in my personal life, I get wrapped up in it." She hated people as they were hypocritical. Most of her past positions told her to find other work after she would go off-hitting [sic] walls and throwing things. She stated to psychiatrist Wickett "Amazingly enough the last job kept me around after I did those things.' [sic] She acknowledged to psychiatrist Wickett that she liked to be in control of situations. (Exhibit 1F) There is no evidence of her ever being terminated from a position.

. . . .

In the area of emotional and cognitive functionality and coping claimant's capacity to cope adaptively with the emotional and cognitive challenges overall in typical workplace settings is moderately impaired. She has adequate coping skills but can be sarcastic at times. She can accept instructions from supervisors, however, may [sic] not respond appropriately to criticism from superiors. She can work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes. She can respond appropriately to co-workers and general public and relate to general public and maintain socially appropriate behavior.

. . . .

Claimant's capacity to cope with the typical/cognitive demands of basic work-like tasks is adequate for occupational purposes. She can process subjective information accurately and use appropriate judgment. She can maintain attention and concentration for more than brief periods of time and perform and complete work tasks in a normal work day or week at a consistent pace without needing frequent breaks or operating at a slower pace.

(Adm. Rec. at 513). While the Court recognizes that record evidence exists to demonstrate some difficulty in maintaining social functioning at work and in maintaining concentration, persistence or pace, the ALJ determined otherwise. As noted from the evidence outlined above, there is substantial evidence in the record to support his determination. Dr. Wickett noted that plaintiff could smile when she spoke of things that she enjoyed. (*Id.* at 111). Dr. Wickett also found that plaintiff's thought processes showed no looseness of movements, her speech was easily understood, her intelligence quotient was within normal limits and she related well. (*Id.*). And while Dr. Wicket

recommended therapy to relieve plaintiff's depression, she found plaintiff competent to manage her own affairs. (*Id.*).

In addition, Dr. Dolh evaluated plaintiff's functional limitations as the result of mental disorders as slight to moderate and found none severe. (*Id.* at 128). Dolh found no significant problems in plaintiff's functional capacity assessment and concluded that she was "able to interact appropriately in casual settings [and] respond to [positive] supervision." (*Id.* at 132). While there is certainly evidence in the record to support plaintiff's allegation of affective disorder, the ALJ chose to rely on evidence similar to that listed above. Weighing the evidence in the record is the responsibility and task of the ALJ, not the Court. *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001).

Plaintiff alleges that the ALJ erred four times in assessing the medical evidence: (1) When he asserted that plaintiff suffers from degenerative disc disease while the evidence clearly demonstrates a herniated disc; (2) When he allegedly attached "some significance" to the fact that plaintiff is not a surgical candidate relating to her herniated disc; (3) When he presumed that plaintiff was not currently under any present treatment for physical or mental problems while the evidence demonstrates that she is still on medication and presented to doctors; and (4) When he concluded that plaintiff took no medication currently. Pretermitting any discussion of these arguments, the Court notes that even were it to hold that the ALJ erred in assessing the medical evidence – which it does not – such a holding would have little, if any, bearing on the Court's conclusion that substantial evidence supports the ALJ's conclusion that plaintiff is not disabled under Sections 1.04

and 12.04.[5]  None of the alleged errors impacts the requirements under Sections 1.04 and 12.04, which plaintiff fails to meet.

> **3.      Whether substantial evidence supports the ALJ's Residual Functional Capacity ("RFC") Determination**

Citing Social Security Administration Ruling ("SSR") 96-8p, the Fifth Circuit has defined residual functional capacity ("RFC") as

> an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past work. . . .  RFC involves both exertional and nonexertional factors.  Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately.  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (quoting SSR 96-8p) (internal citations and quotations omitted).

Ultimately, the ALJ here determined that plaintiff has the following RFC:

Considering the evidence of record and claimant's testimony, I find that she can

---

[5]      In his opinion, the ALJ stated, "She is not a surgical candidate."  (Adm. Rec. at 517). Plaintiff argues that this statement implies that the ALJ believed that were plaintiff to undergo surgery, her condition would vary.  But the Court does not find this statement so remarkable.  The statement is no more than a factual observation: Indeed, plaintiff is not a surgical candidate.  There is no evidence that the ALJ himself placed much emphasis on the comment.

> lift/carry and push/pull up to twenty pounds occasionally. She can sit for at least six
> hours out of an eight hour day and can stand and/or walk each for at least six hours
> out of an eight hour day. She has to avoid performing work involving direct contact
> with others and minimal contact with managers and co-workers. Work with
> inanimate objects is preferred.
> . . . .
> I find that although claimant's past work of hostess, waitress, cashier and computer
> salesperson are precluded as they require constant contact with the public and
> managers/co-workers that [sic] her current work of projectionist in a movie theater
> is not.

(Adm. Rec. at 520). The ALJ noted that plaintiff was not accommodated in any way at her

projectionist job, where, at the time of the opinion, she had worked for nearly three years. (*Id.*).

Because plaintiff was capable of returning to her past relevant work as a projectionist in a movie

theater, the ALJ concluded that she had failed to demonstrate the existence of functional limitations

resulting from her medical conditions that would prevent performance of past relevant work. (*Id.*).

Plaintiff argues that the ALJ erred when he relied on the testimony of vocational expert

Patricia Ehlinger who, she asserts, failed to consider the physical and mental demands of each job

classification. Ehlinger testified that plaintiff can work as a general office clerk, order filler, audit

clerk or film projectionist. (*Id.* at 494). Ehlinger also testified that mild to moderate pain would have

no significant effect on these employment positions. (*Id.*). With no citation to law or fact, plaintiff

argues that this is error. The Court rejects such an unsupported argument. Moreover, that

Ehlinger's testimony may conflict with the testimony of Katrina Virden, who testified at the 2002

hearing, is of no moment. The ALJ was not bound by the testimony from the first hearing after

remand from the Appeals Council.[6]

---

[6]    Plaintiff also contends that the ALJ failed to mention the Dictionary of Occupational
Titles ("DOT") in his RFC determination. However, a review of the ALJ's opinion

Plaintiff's main argument here is that the ALJ failed to consider the elements of fibromylagia, symptoms of irritable bowel syndrome, chronic headaches, insomnia, severe fatigue, sensitivity and generalized joint pain and memory problems in his RFC determination. Plaintiff concentrates largely on Dr. Lesser's alleged finding of fibromyalgia. The Court has already addressed the ALJ's finding that fibromyalgia is not a medically-determinable condition under the circumstances here, and the Court rejects this argument. *See supra* page 20-21. Moreover, the argument that the ALJ failed to consider all of plaintiff's other symptoms is without merit. The ALJ carefully considered and detailed all of plaintiff's symptoms revealed by the medical records that she introduced into evidence. (*Id.* at 506-17). The SSA reserves to the Commissioner the final responsibility to determine an individual's RFS and the ultimate question of whether an individual is disabled under the SSA. *Tamez v. Sullivan*, 888 F.2d 334, 336 n.1 (5th Cir. 1989). The Court finds that substantial evidence supports the ALJ's RFC determination. Most unhelpful to plaintiff's argument is that – at least at the time of the ALJ's hearing – plaintiff had been working as a theater projectionist for nearly three years. The Court can not reject the ALJ's determination that plaintiff can return to her past work as a theater projectionist when plaintiff had been performing such work for nearly three years at the time of the ALJ's opinion. The Court finds that the ALJ's RFC assessment is consistent with the record and is a proper resolution of any conflicts in the evidence. *See Lovelace v. Brown*, 813 F.2d 55, 59 (5th Cir. 1987).

**4. Whether the ALJ erred when he determined that plaintiff is not eligible for a**

---

reveals that he carefully considered the demands of a theater projectionist and compared them to the demands of the DOT. (Adm. Rec. at 520). Accordingly, this argument lacks merit.

**trial work period.**

Contrary to plaintiff's arguments, the Court summarily rejects this argument. The ALJ concluded that plaintiff had engaged in substantial gainful activity when she returned to part-time work after the alleged disability onset date of September 11, 1996. (Adm. Rec. at 521).[7] Plaintiff argues that even if she engaged in substantial gainful activity, she is entitled to a trial work period during the pendency of her application for DIB. Under the regulations, work activity performed during a trial work period does not constitute substantial gainful activity and may not demonstrate that a disability has ended. 42 U.S.C. § 422(c)(2); 20 C.F.R. § 404.1592(a).

However, a plaintiff may qualify for a trial work period only if she qualifies as disabled under the SSA. 20 C.F.R. § 404.1592(e). Here, the ALJ concluded that plaintiff had never been disabled under the SSA, and, thus, her work activity did not qualify as a trial work period. Such a conclusion is not error. *Cieutat v. Bowen*, 824 F.2d 348, 358-59 (5th Cir. 1987).

## VI. CONCLUSION

For the reasons listed above, **IT IS RECOMMENDED** that plaintiff's Motion for Summary Judgment be DENIED, the Commissioner's Cross-Motion be GRANTED and that plaintiff's complaint be dismissed with prejudice.

## NOTICE OF RIGHT TO OBJECT

Objections must be: (1) specific, (2) in writing, and (3) served within fourteen (14) days after

---

[7] If a plaintiff engages in substantial gainful activity during the 12-month duration period, the inquiry ends at step one, and the claimant is not entitled to benefits. *White v. Heckler*, 740 F.2d 390 (5th Cir. 1984).

being served with a copy of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) & 72(b).

A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the un-objected-to factual findings and legal conclusions accepted by the district court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this <u>3rd</u> day of March, 2010.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**